VINCENT J. CACCAMISI, Plaintiff in Error v. VIVIAN THURMOND, Defendant in Error.—282 S. W. (2d) 633.

Western Section at Jackson. November 22, 1954.

Petition for Certiorari denied by Supreme Court, May 6, 1955.

Petition to Rehear denied by Supreme Court, June 10, 1955.

246

W. J. Chiapella, of Memphis, for plaintiff in error.

Davis & Davis, Earle P. Davis, and Tanner Davis, all of Memphis, for defendant in error.

BEJACH, J. For convenience the parties will be styled as in the lower Court, plaintiff and defendant.

The plaintiff, Vivian Thurmond, filed a declaration against the defendant, Vincent J. Caccamisi in the Circuit Court of Shelby County, Tennessee. Her declaration consisted of two counts. In each count she asked for damages, actual and punitive in the sum of $50,000. The first count sues for seduction. The second count sues for breach of promise to marry. Count one of the declaration alleges:

"That the plaintiff is an unmarried citizen of Shelby County, Tennessee and that the defendant is a resident citizen of Shelby County, Tennessee.

"That in the year of 1945 when plaintiff was seventeen years of age, she was working in a restaurant. The defendant, who at that time was thirty nine years of age and with whom plaintiff was not acquainted, came to said restaurant on frequent occasions in an effort to meet her and go out with her. Plaintiff refused the defendant's advances and ultimately quit that job in an effort to get away from him. Though plaintiff secured a job at another restaurant, defendant ascertained her whereabouts and forced his attention upon her to such an extent that she was again compelled to quit and seek other employment.

"A short time later, when plaintiff was eighteen years of age, defendant saw her on her way home from work in the evening and offered her a ride in his automobile, which she refused until defendant introduced her to his sixteen year old son, by a former

marriage who was in said automobile and assured her that his said son would ride to her home with him. Whereupon, the plaintiff accepted the invitation and allowed the defendant to drive her to her home. Upon this occasion defendant acted in a very gentlemanly manner but through this device obtained her home address. Thereafter for a period of approximately two months the defendant often called plaintiff on the telephone, had other persons call her and wrote her approximately three or four letters per week in an effort to have her go out with him in the evenings. Plaintiff continuously refused his invitations until on one occasion on or about the fifteenth day of January, 1947, when a woman with whom plaintiff was acquainted called her on the telephone and requested her to go out with the defendant that night, assuring plaintiff that she, the friend and her escort would spend the evening with the plaintiff and defendant. Plaintiff accepted this invitation and at the appointed time defendant called for her at her home. However, they did not meet the other couple as plaintiff had expected. Nevertheless, the defendant showered attention upon plaintiff and treated her in such a gentlemanly manner that she felt perfectly safe to go out with him unchaperoned. On this occasion the defendant took plaintiff to his jewelry store on the pretext of having some unfinished business to attend to. While there the defendant saw plaintiff admiring a piece of jewelry and promptly made a present of same to her. The same evening, upon ascertaining the place of plaintiff's employment and the type of work she performed, undertook to induce her to discontinue her job, offering to pay her the same amount of money to take employment

in his store, assuring her that the work would be very light and much more suited to her.

"Plaintiff was so impressed by defendant's gentlemanly actions and courteous attention to her that when he asked her to go out with him the next night she readily agreed, and subsequently went out with him each evening for a period of approximately one week. During this period of time defendant continued to treat plaintiff with respect, was very kind to her, made numerous gifts of jewelry and clothing, and did persuade plaintiff to quit her job and induced her to take the above described employment in his store.

"Defendant told plaintiff that he was in love with her, and asked her to marry him. After she accepted employment in his store defendant told the other employees and many customers that she was to be the new 'missus' around there.

"Defendant courted plaintiff so fervently that at the end of this period of time, she was, or thought she was, in love with him, and had accepted his proposal of marriage.

"On one occasion after the above described courtship, the defendant induced plaintiff to accompany him to his living quarters in the rear of his store for the purpose of having a drink. The plaintiff was not accustomed to drinking intoxicants, she had acquired a sense of security with the defendant that she did, after much persuasion, go with the defendant to said living quarters and accept a drink. The defendant after plaintiff had drunk said drink, then persuaded her to drink another, assuring her that she would not become intoxicated by having consumed two drinks of whiskey. Thereafter, defendant made ardent love

to plaintiff, vowing his love for her, and again repeating his promise of marriage. By defendant's false and fraudulent acts, promises, inducements and persuasion, defendant induced the plaintiff to consent to an act of illicit intercourse, this consent being given as a direct result of the acts and conduct of the defendant at said time, as aforesaid.

"Defendant by the further use of artifice, deception, false and fraudulent acts, over persuasion and continuous promises of marriage induced the plaintiff to submit to like acts on numerous occasions over a period from the time of the first act, as above mentioned, until on or about the 1st day of Nov. 1952.

"During the above described period of time and as a result of the above described act of seduction, plaintiff became pregnant, and on the 7th day of November, 1947, plaintiff gave birth to a girl child, which child from the date of its birth has been known by the name of Sandra Rose Caccamisi.

"Plaintiff would show that throughout the above described period of time defendant has continued his promise of marriage and that she has, particularly since the birth of said child, urged the defendant to marry her. Although defendant has during said period of time purchased and given to the plaintiff an engagement ring and a wedding ring; has continuously since the birth of said child accepted her as his own child; has during said period of time made gifts of clothing and other items of personal apparel to plaintiff, and on occasions too numerous to enumerate held her out to the public, her friends, and her family as his wife. He has on each occasion when the plaintiff has urged him to enter into the ceremony of marriage advanced some reason or excuse

for further delay, to plaintiff's great humiliation and embarrassment, until Nov. 1952, when it became obvious to plaintiff that the defendant did not intend to marry her at all.

"Plaintiff alleges that the defendant is guilty of the continuous act of seduction as aforesaid from on or about the 25th day of January, 1947, to the 1st day of Nov. 1952; that said act was accomplished by artifice, deception, over persuasion, and a continuing promise of marriage made for the purpose of accomplishing said seduction; and that the plaintiff was made willing to part with her virtue by the said false and fraudulent acts, promises, inducements and over persuasion of the defendant, as aforesaid."

It is not necessary to quote the allegations of count two of the declaration because that is no longer involved in this litigation.

Defendant filed pleas of not guilty and special pleas, the general tenor of which was a complete denial of all the allegations of plaintiff's declaration. In said plea, he alleges that the plaintiff was made pregnant by another man, and undertook to force the child on him; denies that he has recognized said child as his and denies that she is his child. With reference to the gifts claimed by plaintiff to have been given her by defendant, he claims that many of them were actually appropriations of his property by the plaintiff. He alleges that he has tried on repeated and numerous occasions to rid himself of the plaintiff and on many occasions it was necessary for him to call the police and have the plaintiff arrested and put under a peace bond to protect himself, his property and his employees. He alleges that the plaintiff was not a virgin at the time of their first act of intercourse, and alleges that the plaintiff advised him that she was mar-

ried at that time, and that so far as defendant knows, she may still be married. He pleads that by reason of her being a married woman, her suit does not fall within the provision of Section 8628 of the Code. These pleas contain no reference to the Statute of Limitations.

Pursuant to an order of Court requiring him to plead specially, the defendant did file special pleas. These special pleas merely reiterate and elaborate with some additional details on the pleas previously filed by the defendant, but set up no new or additional ground of defense. Again, there is no mention of the Statute of Limitations. After the introduction of plaintiff's proof in the case, the defendant made "a motion for peremptory instruction on both counts of the declaration, and made a further motion that in the event the motion for peremptory instruction is not granted, that the plaintiff be required at this time to elect as to which count she will proceed upon, as is required or provided for by the 1949 Act." The 1949 Act referred to, is carried forward into the 1950 Supplement to the Code of Tennessee in Sections 8462.1 to 8462.5. Section 8462.5 provides that "No action for the breach of promise of marriage can be joined or tried with any other action for damages." After some argument of counsel, the trial judge allowed the defendant to amend his plea so as to set up provisions of the said Act of 1949. Whereupon, the plaintiff elected to proceed on the seduction count which is count one of the declaration. The Court then overruled the motion for a peremptory instruction.

At this time, after the Court had overruled the motion for a directed verdict, defendant made a further motion for leave to amend his pleas so as to file a plea of the Statute of Limitations to the seduction count; which motion was overruled by the Court and to which action the

defendant excepted. Thereupon, the defendant offered his proof, at the end of which he renewed his motion for a peremptory instruction and also renewed his motion to be allowed to plead the Statute of Limitations, both of which motions were overruled by the Court and exceptions noted. After the Court's charge, the jury retired and returned a verdict in favor of the plaintiff for $10,000, consisting of $5,000 actual damages and $5,000 punitive damages.

After a motion for a new trial had been made and overruled by the trial court, an appeal in the nature of a writ of error was prayed and perfected to this Court.

The defendant, as plaintiff in error, has filed sixteen assignments of error in this Court, as follows:

"(1) There is no evidence to support the verdict.

"(2) The verdict is contrary to the weight and preponderance of the evidence.

"(3) The verdict is contrary to the law applicable to this case.

"(4) The Court erred in overruling defendant's motion for a new trial. (R. 28).

"(5) The Court erred in refusing to permit defendant to file a plea of the statute of limitations to Count 1. (R. 178,238).

"(6) The Court erred in denying defendant's motion for peremptory instruction at the close of all of the proof. (R. 238).

"(7) The Court erred in refusing to give in its charge to the jury defendant's special request No. 1, to wit:

"'Gentlemen of the jury, I charge you that the plaintiff has failed under the law to prove a promise of marriage or breach thereof.'

"This was error because same was tendered in writing at the close of the general charge and before the jury retired. It correctly states the law, is applicable to the facts, was not covered by the general charge, was specifically stated in the motion for new trial and decided adversely to defendant.

"(8) The Court erred in refusing to give in its charge to the jury defendant's special request No. 2, to wit:

" 'Gentlemen of the jury, I charge you that the plaintiff has failed to prove a breach of promise of marriage and you shall not consider such in aggravation of damages for seduction.'

"This was error because same was tendered in writing at the close of the general charge and before the jury retired. It correctly states the law, is applicable to the facts, was not covered by the general charge, was specifically stated in the motion for new trial and decided adversely to defendant.

"(9) The Court erred in refusing to give in its charge to the jury defendant's special request No. 3, to wit:

" 'Gentlemen of the jury, I charge you that the plaintiff must prove the alleged contract of marriage by written evidence of such contract or by two disinterested witnesses.'

"This was error because same was tendered in writing at the close of the general charge and before the jury retired. It correctly states the law, is applicable to the facts, was not covered by the general charge, was specifically stated in the motion for new trial and decided adversely to defendant.

"(10) The Court erred in refusing to give in its

charge to the jury defendant's special request No. 4, to wit:

"'Gentlemen of the jury, I charge you that if you find it was contrived by plaintiff to throw herself in defendant's way with a view to the result which happened, then you shall find for defendant.'

"This was error because same was tendered in writing at the close of the general charge and before the jury retired. It correctly states the law, is applicable to the facts, was not covered by the general charge, was specifically stated in the motion for new trial and decided adversely to defendant.

"(11) The Court erred in refusing to give in its charge to the jury defendant's special request No. 6, to wit:

"'Gentlemen of the jury, I charge you that should you find for the plaintiff the damages to be recovered are in the sound discretion of the jury, under the circumstances surrounding the case, and you in your discretion may look to the rank, condition and estate of defendant in assessing damages.'

"This was error because same was tendered in writing at the close of the general charge and before the jury retired. It correctly states the law, is applicable to the facts, was not covered by the general charge, was specifically stated in the motion for new trial and decided adversely to defendant.

"(12) The Court erred in refusing to give in its charge to the jury defendant's special request No. 8, to wit:

"'Gentlemen of the jury, I charge you that should you find that plaintiff and defendant mutually engaged in sexual intercourse for any reason not in-

duced by fraud of defendant, then you shall find for defendant.'

"This was error because same was tendered in writing at the close of the general charge and before the jury retired. It correctly states the law, is applicable to the facts, was not covered by the general charge, was specifically stated in the motion for new trial and decided adversely to defendant.

"(13) The verdict is excessive.

"(14) The verdict is the result of passion, prejudice, partiality or caprice on the part of the jury.

"(15) There was no evidence upon which the jury could assess punitive damages against the defendant.

"(16) The Court erred in denying defendant's motion for new trial because the Court's charge, taken as a whole, was meager, inadequate, misleading to the jury and prejudicial to the defendant in that the jury was required to do nothing but find that defendant seduced plaintiff on one occasion approximately seven (7) years before the trial and the filing of her suit."

It is not necessary in this opinion to review in detail the evidence in this cause, the material parts of which consist mainly of the testimony of the plaintiff herself and that of the defendant. Their testimony presents a sordid picture of illicit relations between the plaintiff and the defendant between January, 1947 and November, 1952. This period was broken, from time to time, by quarrels and separations, arrests and peace warrants, and the birth of a child about nine months after the relations began. Defendant's testimony discloses he married another woman after the institution of the present suit.

258

■ Plaintiff's testimony and that of the defendant are in the main, totally contradictory and irreconcilable each with the other. Unless the motion for peremptory instruction should have been granted, review of this testimony is unnecessary, and, on this record, we can see no reason for holding that the Court erred in denying the motion for a peremptory instruction. If the jury believed the testimony of the plaintiff herself, and it is apparent from the verdict that it did, the testimony was ample to support the verdict. That forecloses the matter in this Court, except for examination of the other errors assigned.

Some excerpts from the plaintiff's own testimony and from letters written by her to defendant, which letters were filed as exhibits to plaintiff's testimony, may, however, serve to throw light on this Court's disposition of the jury's award of punitive damages. Same are accordingly quoted for that purpose.

On direct examination plaintiff testified, as appears in the Record at page 44, as follows:

"Q. Go ahead. I will ask you, Miss Thurmond, state whether or not you and Mr. Caccamisi lived together as husband and wife? A. Yes sir.

"Q. Where? A. We lived together before our daughter was born. We lived on Barton St. where we were living at the time she was born, and we moved when she was three weeks old on East Trigg, and then we separated. I left him. I went back to him and we lived behind his place of business and we have separated many, many times, and I go back to him, and the last two years that I lived with him, we lived on Calhoun St."

On cross examination, at page 68 of the Record, plaintiff testified:

"Q. Have you ever lived in Friars Point, Miss.? A. I was forced by Mr. Caccamisi to take my child out of Memphis, for he went to the Juvenile Court to have it taken away from me, and he told me later on it was his first wife that did it, and it wasn't him and it scared me. I didn't know anything about anything like that and I couldn't know about that, and I took my child and left late at night and left for Friars Point where I had some relatives."

Also on cross examination, at pages 74-75, she testified:

"Q. How long did you live with him? A. I don't know. We have been separated so many times and lived together so many times. I can't tell you."

On further cross examination, at page 82, she testified:

"Q. And were you dating Mr. McCormick at the time you met Mr. Caccamisi? A. That is right.

"Q. Do you know just where Mr. McCormick is now? A. I saw him last, it has been over a year ago since I saw him.

"Q. Mr. McCormick is a married man? A. No, sir; he wasn't married at the time I was going with him. I mean, I was engaged to him.

"Q. You were engaged to him? A. That is right.

"Q. You were engaged to him prior to the time you went with Mr. Caccamisi? A. I was engaged to him before I met Mr. Caccamisi."

The following language appears in a letter written by plaintiff to defendant, which is filed as Exhibit 3 to her cross examination:

"* * *. But my board is due and I allso need soom money for the other thing's & I know you can if you care any-thing about me you will be willing to help me when I am in a tight. I could go to my husband & he would give me what I need but I don't

want to ask him for anything as it would give him a right to hang around me.''

The following is quoted from a letter written by plaintiff to defendant, which letter is filed as Exhibit 4 to her cross examination:

* * * ''I was home yesterday sleeping and you thought I was out with someone esl but I wasn't. You could have called Mother and she would have told you the truth. Darling I know things are slow & you don't know how I hate to ask you for something but I rather ask you than Mac may husband. I know he would give me what I need he makes about $16.00 every 2 weeks driving bus & he draws $75.00 from the Government for he was shot in the back in the War & then he is going to school drawing $35.00 a month from that. But if I was to ask him for anything I would have to put up with him.

''My check didn't come this week, as I thought & went to see about it & they said I would get it next week.

''Mom & Dad need my Board & they know I can get it from Mac & that is why I pay them to keep them from getting it from Mac. When I got my divorc I was to weak to work as I just had lost by Baby & nearly died my-self, as I was unconscious 4 day's & night's & I had to take four pints of Blood & when I come out of the hospital I was to weak to walk & weigh 92 pound's.

''The Judge made Mac pay me $60.00 a month for a year till I was able to work. I took it four month's & then I went to work & told him I wanted nothing from him. He said he saved it every month anyway & put it in my name so I couldn't get him in any trouble &c.

"But I don't want it & I rather *die* than take it. But the point is I have to have fifteen dollars to pay Board & have some clothes cleaned. I know I said I wouldn't ask you for any more but I have to darling or get in touch with Mac and that would tickel him to death. My check is coming next week and I will not ask you again for money. I hate to ask you Angel but I have to.

"I love You
Vivian"

The following letter from plaintiff to defendant filed as Exhibit 9 to cross examination of plaintiff, is quoted in its entirety, as follows:

"Vince Just got out of jail send me $36.00 so I can get my clothes. You won't be bother with me any more & I sure don't aim to bother with you. Not even if you see me on the street don't even speak to me. You've done ever thing a man can do to a woman you done it to me & I'll hate you till the day I die.

"You send me the money so I can get my clothes & you are getting off cheap *You needn't worry about me sueing you I won't as long as you leave me alone & you send me this money to get my clothe's we'll call it even* & I'll raise your child. But some day you'll pay before you die & you know it too but I'll leave it up to God you'll get what's coming to you & I'll pray that you do. You better send this money or I'll Vivian
make you wish you had and I'll make you put out more than $36.00."

There is no date on any of the letters, quoted and referred to above.

On further cross examination, at page 108 of the Record, the plaintiff testified as follows:

"Q. How do you explain all these letters you wrote about your former husband? A. Mr. Caccamisi was told when he met me I was married. He seemed to like the idea I was married and you have to humor him like a child. I let him believe whatever he wanted to."

And further, at pages 118-119:

"Q. When did you stop leaving Mr. Caccamisi alone? A. When did I stop leaving him alone?

"Q. Yes. A. I have stopped leaving him alone many, many times.

"Q. I mean have you stopped now? A. I don't bother. I haven't talked to him in over a year."

Aside from the question raised as to the defendant's motion for peremptory instruction and lack of evidence to support the verdict, which have been disposed of above, the assignments of error may be divided into four groups, or may be said to present four questions for consideration by this Court, as follows:

(1) That the trial Court erred in refusing to permit defendant to file a plea of the Statute of Limitations,

(2) That the Court erred in refusing to give six special instructions to the jury which had been requested by the defendant,

(3) That the Court erred in denying the defendant's motion for a new trial because the Court's charge, taken as a whole, was meager, inadequate, misleading to the jury, and prejudicial to the defendant in that the jury was required to do nothing but find that defendant seduced plaintiff on one occasion, approximately seven years before the trial and the filing of her suit,

That the verdict is excessive, is the result of passion, prejudice and partiality or caprice on the part of the jury; and that there is no evidence upon which the

jury could have assessed punitive damages against the defendant.

(1) The first question to be disposed of has to do with the Statute of Limitations. Section 8595 of the Code of Tennessee fixes the limitation on this type of action, as follows:

"Actions for libel, for injuries to the person, false imprisonment, malicious prosecution, criminal conversation, seduction, breach of marriage promise, and statutory penalties, within one year after cause of action accrued."

The case of Franklin v. McCorkle, 84 Tenn. 609, 1 S. W. 250 holds that the Statute of Limitations of one year in a seduction case begins to run when the offense is complete and the cause of action accrues, and that the Statute of Limitations becomes operative thereon with the first act of sexual intercourse. In the case of Davis v. Young, 90 Tenn. 303, 16 S. W. 473, the case of Franklin v. McCorkle was expressly overruled. In this case, the Supreme Court of Tennessee, speaking through Turney, C. J., said:

"A demurrer to the declaration was sustained, on the ground that the suit was brought more than 12 months after the day laid in the declaration. This was error. The averment is that the acts constituting the wrong complained of were committed under a promise of marriage, and that such promise was continued and renewed from time to time to a period less than 12 months before the bringing of the suit. Trusting to the good faith of the defendant, and relying upon his promises, the daughter was overreached. The promise continued to influence her, and each yielding must be accredited to the promise. It is not presumable that the promise was meant by the

one and understood by the other to be carried out and performed immediately after the accomplishment of his first act of defilement, but at some future time. As it was alone upon the faith of the promise that the purpose of the defendant could be achieved, it follows as of course that each successive submission by the daughter was in consideration of that promise, and so understood by the defendant. Therefore the seduction is made up of the several violations by the defendant, and he will not be permitted to confine her remedy to the first illicit act, as the only one of seduction, and, when sued, relieve himself by showing that first act to have occurred more than 12 months before suit was brought. Such limitation places it in the power of the unprincipled to effect the ruin of the confiding female, and then, by flattering the confidence and hopes of his victim, persevere in her debauchery at his will, and at last ignore all his cruel deceptions of the meantime, and insult the disgrace he has brought about by replying the 12-months statute as applicable to the first act in his series of villainy. It should never be that one, by confessing his infamy, may, by multiplying the evidences of that infamy, acquit himself from accountability for its consequences. To hold that, under promise of marriage, deceitfully made, for the purpose of seduction, the first illicit act completes the offense, and the statute then begins to run, is to offer a reward to the unscrupulous to do many wrongs, that he may escape the bitter consequences of his deceit, and to have him know that, the longer he practices his frauds and imposes upon a trusting woman, the more sure he is of going unwhipped of justice. Franklin v. McCorkle, 16 Lea, 609 [1 S. W.

250], is overruled." Davis v. Young, 90 Tenn. 303, 305, 16 S. W. 473.

In the later case of Ferguson v. Moore, 98 Tenn. 342, 39 S. W. 341, in which case, the plaintiff suing by next friend was the victim of the seduction, it was insisted that Davis v. Young should be overruled or at least limited and distinguished on the ground that the rule of Davis v. Young should not be extended to cover a case where the plaintiff was herself the party seduced. Davis v. Young involved a suit by the father of the girl seduced; but the Supreme Court, speaking through Wilkes, J., refused to draw this distinction. In thus disposing of this contention, he said:

"It is assigned that the circuit judge was in error in charging that seduction was a continuous act, and if, by several continuous acts, promises, and artifices, the defendant kept up his illicit intercourse until September, 1894, and the action was brought in February, 1895, then the action would not be barred by the statute of limitations. It is admitted that this is in accord with the holding of this court in Davis v. Young, [6 Pickle, 303] 16 S. W. 473, but it is insisted that case should be overruled, or, at least, not extended to cases where the suit is by the seduced female, instead of the father, as in that case. We have no disposition to overrule or limit the case in its application as suggested." Ferguson v. Moore, 98 Tenn. 342, 347, 39 S. W. 341, 342.

Although the case of Ferguson v. Moore reversed the verdict of the trial court and granted a new trial for errors in other parts of the trial judge's charge, the rule announced in Davis v. Young has been adhered to consistently in subsequent decisions of our courts. In the

case of Heggie v. Hayes, 141 Tenn. 219, 208 S. W. 605, 3 A. L. R. 150, it was held that,

"Although contract of marriage was not entered into prior to the first unlawful act, if the contract existed thereafter concurrently with the illicit intercourse, such contract of marriage was sufficient to prevent the defendant from referring the statute of limitations to the first unlawful act."

It is insisted in the instant case, however, that because of the numerous breaks in the relations between the parties to this suit, interrupted by their complete severance of relations, but followed by subsequent renewals, that plaintiff in the present case at bar should not be permitted to rely on the authority of the cases holding that a continuing promise of marriage prevents the Statute of Limitations from being tolled. We are inclined to agree with this view of the case; and if the Statute of Limitations had been pleaded in the instant case, we are disposed to the view that it probably should have been sustained as a bar to the action. The trouble with appellant's taking this position in the instant case, however, is that the Statute of Limitations was never pleaded. It cannot help the defendant here to say that if he had pleaded the Statute of Limitations, such plea would have been sustained. Unfortunately for him, no such plea was filed and no effort to file same was made until it was too late.

That brings us to the real question presented on the record in this case with reference to the Statute of Limitations. It is contended that the trial judge abused his discretion in refusing the application of defendant to be allowed to amend his pleas so as to plead the Statute of Limitations of one year. It is an entirely different proposition to say that the plea of the Statute of Limitations, if same had been filed on behalf of defendant, would have

been good and should have been sustained, from saying that the trial judge erred by abusing his discretion in refusing to allow such plea to be filed, belated as was the application so to amend. Defendant's application to amend his pleas so as to plead the Statute of Limitations was not made until after all of the plaintiff's evidence had been introduced and the plaintiff had rested. Actually the application was not made until after the Court had overruled a motion for directed verdict, and after the Court had required the plaintiff to elect whether she would stand on count one of her declaration, which sued for seduction, or on count two of same, which sued for damages for breach of promise of marriage and after she had elected to stand on count one, the seduction count. Furthermore, in the earlier stages of this law suit, the defendant had been required by order of court to plead specially, and did file additional special pleas. Then, if ever, was the time for him to have asserted the defense of the Statute of Limitations in this cause.

In any case, the allowing or refusing an amendment to pleadings is within the sound discretion of the Court and will not be reversed unless that discretion is abused; such discretion has been seldom adversely reviewed on appeals; and it will be presumed that allowing or refusing an amendment was done in the exercise of legal discretion, in the absence of a showing to the contrary. Plantt v. Plantt, 28 Tenn. App. 79, 186 S. W. (2d) 338; Payne v. Eureka Security Fire & Marine Ins. Co., 175 Tenn. 134, 133 S. W. (2d) 456; Chattanooga Ice Delivery Co. v. George F. Burnett Co., Inc., 24 Tenn. App. 535, 147 S. W. (2d) 750; Williams Code of Tenn. Sec. 8711; Reagan v. McBroom, 164 Tenn. 476, 51 S. W. (2d) 995.

In Gibson's Suits in Chancery, dealing with the

question of what amendments may be made to answers, Higgins and Crownover's 4th edition of this textbook, says:

"But no amendment will be allowed in order to plead the statute of limitations, or the statute of frauds, unless perhaps where the application to amend is made with great promptness; nor will an amendment be allowed to set up any unconscientious defense." Gibson's Suits in Chancery (4th ed.) Sec. 435.

As authority for the above quoted proposition, Gibson cites 1 Dan. Ch. Pr., 781; Cock v. Evans' Heirs, 17 Tenn. 287, 288; Stull v. Goode, 57 Tenn. 58; Cook v. Bee, 2 Tenn. Ch. 343, 344; Wilson v. Wilson, 70 Tenn. 17. These authorities amply support the text. While the instant case is one at law and not in equity, nevertheless, the principles applicable to allowing amendments should be highly persuasive.

■ A Statute of Limitations that merely bars the remedy must be pleaded to be available. German Bank v. Haller, 103 Tenn. 73, 52 S. W. 288.

■ On the record of the instant case, we cannot say that the trial judge abused his discretion in denying the application of the defendant to amend his pleas so as to plead the Statute of Limitations of one year. The assignments of error raising questions as to the Statute of Limitations must all be overruled.

■■ (2) The next group of assignments of error to be disposed of deal with the alleged error of the trial judge in refusing to give six separate special instructions requested by the defendant. These special requests are all copied in the assignments of error quoted above and need not be recopied here. Two of these special requests deal with the question of defendant's promise of marriage

and of the method of proof of same required of plaintiff. After the plaintiff elected to stand on the seduction count of her declaration, the suit for breach of promise to marry was no longer involved, and these requests were not applicable to the case. All of the other special requests which were refused by the trial court, were, in the opinion of this Court, sufficiently covered by the general charge of the Court.

(3) The third question, or group, deals with the defendant's assignment of error, "that the Court erred in denying the defendant's motion for a new trial because the Court's charge, taken as a whole, was meager, inadequate, misleading to the jury, and prejudicial to the defendant, in that the jury was required to do nothing but find that defendant seduced plaintiff on one occasion, approximately seven years before the trial and filing of her suit."

██ In support of this assignment of error, defendant's counsel argued in his brief, and in his oral argument at the trial of this cause in this Court, that because of the trial judge's refusal to allow the defendant to amend his pleas so as to plead the Statute of Limitations, an obligation was imposed upon the trial judge to charge the jury with reference to the necessity of a continuing promise of marriage as a requirement for supporting and sustaining the plaintiff's cause of action. The fallacy of this contention of defendant is that no plea of the Statute of Limitations was filed. If a plea of the Statute of Limitations had been filed, it would have been incumbent on the trial judge to charge the jury that such continuing promise of marriage was necessary to prevent the tolling of the statute. With the plea of the Statute of Limitations totally absent, however, the case presented at the trial of this cause, and the one which the trial judge sub-

mitted to the jury, was in all respects the same as if the suit had been filed within one year after the first act of intercourse between plaintiff and defendant. The criticism, therefore, "that the jury was required to do nothing but find that defendant seduced plaintiff on one occasion, approximately seven years before the trial and the filing of her suit" is, therefore, without merit. If this language be rephrased so as to be worded "that the jury was required to find whether or not the defendant seduced plaintiff on one occasion approximately seven years before the trial and the filing of her suit", it is a correct statement of what the jury was required to pass on, in the absence of a plea of the Statute of Limitations.

(4) The fourth and last group of assignments of error to be disposed of in this opinion is that the verdict is excessive, is the result of passion, prejudice, and partiality or caprice on the part of the jury; and that there is no evidence upon which the jury could have assessed punitive damages against defendant.

In the case of Ferguson v. Moore, 98 Tenn. 342, at page 350, 39 S. W. 341, at page 342 of the opinion of the Supreme Court in that case, written by Wilkes, J., it is said:

"The court said to the jury: 'You may give what is called "vindictive damages" to punish the defendant, if guilty, and deter others from doing likewise; and it is not only your right, but your duty, to do so.' This was error. The giving of vindictive damages is a matter of discretion with the jury, and they should not be told that it is their duty to give them."

In the instant case, the trial judge charged the jury:

"Now, this plaintiff sues for both compensatory damages and also sues for what the law calls punitive damages. Now, the law with reference to punitive

damages in Tennessee is this: If you find that a plaintiff is entitled to compensatory damages, that is, if you find from the evidence under the charge of the Court as given to you that the plaintiff is entitled to recover the type damages we have just been speaking about, then, if you further find that the defendant's conduct was willful and oppressive and that his oppressive and willful conduct caused the damages to the plaintiff, then the law permits you, as jurors, to award an amount over and above compensatory damages. And, it is that amount over and above compensatory damages that the law calls punitive damages, that amount being an amount that would punish the defendant, if you so find againt him and deter others in a like situation from committing like offenses. The allowance of punitive damages is a discretionary matter with the jury, provided that you find that the plaintiff is entitled to recover compensatory damages and further find that the conduct of the defendant was willful and oppressive.

''There can be no award of punitive damages without compensatory damages and there can be no award of punitive damages against the defendant whose conduct is not found by the jury to be willful and oppressive.''

This charge, we think, is a correct statement of the law.

In spite of the fact, however, that the trial judge as thirteenth juror, approved the verdict in this cause, which allowed a recovery of $5,000 actual or compensatory damages, and $5,000 punitive damages, making a total verdict of $10,000, we think this amount is excessive. We would be disposed to agree with the contention of defendant, as appellant in this Court, that the case as presented on the record is not a case for punitive damages at all,

but for the rule laid down by the Court of Civil Appeals in the case of Baker v. Bates, 4 Tenn. Civ. App. 175. In that case in the opinion written by Higgins, J., the Court of Civil Appeals said:

"In the sixth assignment of error it is said that the Court erroneously instructed the jury as follows: 'You may, if you deem proper, assess punitive damages.' This insistence is that was a direct command to the jury to assess punitive damages: Ferguson v. Moore, 14 Pickle [342], 349 [39 S. W. 341]. In the latter case it was held that the allowance of punitive damages was a matter of discretion and it was error in the Court to instruct the jury that they should award them. We are of opinion that that is what the trial judge did in the instant case. He simply stated in effect that they might if they deemed it proper to add punitive damages. It is true that the instructions could have been a little more elaborate on the subject, but there was no request for any amplified statement. The proposition laid down by his honor was correct as far as it went. Hence, there can be no assignment of error respecting this matter: [Choctaw, O. & G. R. Co.] v. Hill, 2 Cates [396], 407 [75 S. W. 963].

"It is also urged by learned counsel that the instruction was erroneous for the reason that there is nothing in the declaration authorizing the recovery of punitive damages. In this, we think he is mistaken. Punitive damages are generally awarded in actions of seduction, especially if the seduction was accomplished under a promise of marriage: Goodall v. Thurman, 1 Head, 209. It is not necessary that these damages be claimed *eo nomine*. It is sufficient if the facts alleged justify their recovery. Rail-

road v. Ray, 17 Pickle [1], 6 [46 S. W. 554]; [Southern] Express Co. v. Brown [67 Miss. 260, 7 So. 318, 8 So. 425], 19 Am. St. Rep. [306], 310.''

 On the authority of the above quotation, we think it would be improper for this court to eliminate all of the award of $5,000 made by the jury as punitive damages. That case, as we understand it, is authority for the proposition that, in any case of seduction, the allowance of punitive damages is proper. There is no sound reason, however, why this Court should not, in the exercise of its authority to make suggestions of remittitur, eliminate part of the punitive damages awarded by the jury and approved by the trial judge in the instance case. The authority of this Court to make such suggestion of remittitur is contained in Section 8988 of the 1950 Supplement to the Code of Tennessee, which is as follows:

''Remittitur under protest in court of appeals, and case taken to supreme court whose judgment shall be what.—If the judgment of the trial court, with re-'gard to a remittitur, is affirmed in the court of appeals, so that a party is required to make a remittitur or suffer a new trial, as in the judgment of the trial court, or if, by the opinion of the court of appeals, a further or a larger remittitur is required of the party in whose favor the verdict was rendered, or if after the case was tried in the lower court by the trial judge without a jury, or if after the case was tried in the lower court with a jury and no remittitur was suggested by the trial judge, a remittitur is first suggested or required in the court of appeals, on penalty of granting a new trial; then in each and all of these events the party in whose favor the verdict or judgment has been rendered may make the remittitur

under protest in the court of appeals, and take the case, by writs of certiorari and supersedeas, for review upon that point, to the supreme court; and if in the opinion of the supreme court the verdict should not have been reduced, and the court of appeals was in error in affirming the action of the trial court, as to said remittitur, or if said court of appeals was, itself, in error in suggesting a remittitur for the first time in that court, or in suggesting a further or larger remittitur than that suggested in the trial court, and if the judgment is otherwise correct, the case shall be reversed to that extent, and judgment shall be rendered in the supreme court for the full amount originally awarded by the jury or the trial judge sitting without a jury, as the case may be. (1911, ch. 29, Sec. 2; 1949, ch. 253, Sec. 2.)''

All assignments of error except assignments of error numbers 13, 14 and 15, which assign as error ''that the verdict is excessive, that the verdict is the result of passion, prejudice, partiality or caprice on the part of the jury, and that there was no evidence upon which the jury could assess punitive damages against the defendant'', are overruled, and these last named assignments of error are sustained. This Court, therefore, makes the suggestion of remittitur of $2,500, same to be taken from the award of punitive damages made by the jury, on penalty of the granting of a new trial by this Court, if such suggestion of remittitur is rejected.

If the remittitur hereinabove suggested is accepted by the plaintiff, as appellee, the judgment of the Circuit Court, thus reduced, will be affirmed. If such remittitur is not accepted, this cause will be reversed and remanded to the Circuit Court of Shelby County for a new trial.

The cost of the appeal will be paid, two thirds by defendant, as appellant, and his surety on the appeal bond, and one third by appellee, the plaintiff in the lower court.

Avery, P. J. (W.S.), and Carney, J., concur.